Scott Commission, On behalf of the Board of Trustees, I offer media coverage with other May I please the Court, you have a number of interesting and difficult cases this morning. This one is a piece of cake compared to the court definitely appears to be on its toes. The this case is different. This case, if we stand back and look at what happened in this case, Mr. McLean started this enterprise. It is one of the prime, prime commercial properties in the city of Chicago. He built it. He renovated it. He invited Mr. Tully to come into the deal after it was almost complete with renovations to take out another partner. The Tully defendants invested $1.5 million. As the court I'm sure is aware, there were two loans in this case. Both of them, Mr. Tully was aware of, were being done. He didn't attempt to stop them. The Tully defendant, the Tully plaintiffs get $1.25 million of their $1.5 million investment back within three years. They now have $250,000 invested. They're getting in 2005, as the record shows, $650,000 a year in income. And in this case, because Mr. McLean, as was his want, as was his tactic for cash flow, borrowed and repaid monies to this enterprise, borrowed, didn't steal, didn't take, wasn't attempting to take. Did they repay all the money? Yes. All of it? Yes, except the money that was taken, yes. And if you go through year by year, at the end of most of the six years. Let me ask the question again. Every single penny that was borrowed or transferred or in some way moved from that account was returned. Is that what you're saying? Yes. Now let me ask a simple, a little bit different. Did Mr. McLean and his enterprises, let me just say, did the defendants breach their fiduciary duty? Yes. Thank you. So the only thing we're talking about, correct me again if I'm wrong, is we're talking about money. Absolutely. Absolutely. In this case, you have actual damages which, some of which, are legitimate, which the appellant does not dispute. About $900,000 of actual damages, fees, late penalties that were paid, actual costs to the enterprise, absolutely. That's not the issue here. But in addition, you have actual damages that are punitive in nature, 13 percent on attributed income, seven points above the prime rate. There's not one Illinois case that says that's legitimate. Mr. McClellan, how did the trial judge come, walk me through how the trial judge came up with the 13 percent? There was Let me ask you, correct me if I'm wrong. Didn't Mr. McClellan and one of his other business enterprises, which involved a New York limited liability corporation, borrow money at 13 percent interest? I mean, they found that to be an okay interest rate for that deal, yes or no? It's the reverse. A McClain company loaned money, but that was Wait, I'm not done with the question. I'm moving on from that one. So that was the only evidence before the trial court, Judge Palmer, as to what a reasonable rate of interest would be between private entities of this type on this type of transaction. That was the only evidence that this trial court had before it. Yes or no? No. What else did he That was not this type of transaction. That was a spec building that hadn't been started in a different community. It doesn't matter what the reason for the loan was. It was between two similar enterprises, two similar companies, from McLean. Parties here only meant removal by the members. They didn't say that. It doesn't say that. It says removal. Removal is removal. The manager's gone, that's removal. This was a deal where Mr. McLean, in this deal, which Tully bought into, and Tully bought into and didn't say, oh, I'll buy into it if we amend the contract. He bought into it. The manager was McLean's. He was entitled to be manager. When the court kicked him out, got to dissolve it. The statute, now we have a trial judge who makes the finding which under the statute mandatorily triggers dissolution. Mandatory. Shall. Ignores it. This court has to dissolve this. You have to unwind it, send it back. You'll make a decision on the punitives. You'll make it, which we respectfully submit should either be eliminated entirely or cut down to the same as the actuals, about $1 million. Why? Why? Because you have multiple punitives and the conduct in this case is not, I mean, read Justice Burke's decision. Go back to Pagano again. I argued Pagano to this court four weeks ago. It comes back here again. The standard in a breach of fiduciary duty case for punitives on top of an actual recovery, as opposed to a case where there is no actual damages, a $1 actual, then punitives have a function. But here, you have to have reprehensible conduct. Mr. McClain was not trying to hurt anybody, including his own kids. He was trying to juggle in a horrendous time for real estate. He was trying to juggle. Wasn't trying to hurt anybody. Did a trial of fact found otherwise, though? No, he didn't. No, he didn't. I think he was upset with the conduct. But he, the trial judge did not find malice. Trial judge did not find anything resembling that. He found secrecy. He found improper conduct. Didn't he find the conduct to be reprehensible? I think that that's the word he used, reprehensible. I'm suggesting that that find. Could you answer, that's a question that I'd like you to answer. Did the trial judge, did he or did he not find the defendant's conduct to be reprehensible? I don't recall if he used that word, but in a nutshell, of course he did. Well, I, I do, and he did. He did. And I'm suggesting. Is reprehensible conduct sufficient, in your opinion, to warrant punitive damages? No. And I'm asking this court to say that in a case where a businessman puts his own assets on the line, puts his own assets, is not trying to hurt anybody, is trying to juggle, and does so improperly. He should pay the piper for what he did, but what he shouldn't get is $3 million. What's the purpose of punitive damages, Mr. Epstein? To punish and to deter others. Not to deter this defendant, to deter others. And you don't need $3 million on top of $1 million, and certainly not on top of $2 million to do that. Punishment, in, in order to punish someone, is this punishment proportionate? You know, pain is, punishment is pain, and pain is punishment. And a lot of it has to do with what, the amount of pain that the punish, that the punished person can bear. Mr. McLean testified that he was worth over $100 million. At one time he was. So. He couldn't even post bond in this case. That's a record. And. Testimony was that he was worth over $100 million. So when the trial judge imposes a punitive damages award of $3 million. You know, when measured against the total assets of the, the person who's being punished, can you say that no reasonable person would ever have come to that conclusion? Not after, after giving a million, 900,000 of actual legitimate damages. Giving another million on top of that, which he called actual, which are, which are actually punitive. What is your answer to my question, Mr. Epstein? I'd like you to answer what I ask, and not what you want to ask, what you want to answer. Could you please answer my question? Could you restate the question? Sure. I knew, I knew you were going to say that. I got too far, I apologize, I got too far ahead of myself. I understand you're passionate about your case, but we ask these questions not just to annoy you. We really do want the answers. No, no, I'm entirely appreciative. I'm asking. Sometimes we ask questions to annoy you. What? Go ahead. Well, this one is not to annoy you. It's simply, I'm asking you, can you say that under the facts and circumstances of this case, no reasonable person would have awarded $3 million in punitive damages when measured against the amount of assets that the testimony established the defendant has? If that were the standard, I would say, I couldn't say that was unreasonable. But the standard is not punishing this person and deterring this person based on the assets he once had. It's deterring the rest of the world. It's deterring everybody, not just him. And the other thing, I don't think the court realizes, Mr. Tully testified that this property was worth, based on offers he got back then, $36 million. Mr. McClain testified it was worth 40. There was, as undisputed, there were $18 million in loans outstanding. That's $13 or $14 million of equity. Mr. McClain has lost it, and his kids have lost it all. This isn't $5 million of punitives. This is $13 million. May I ask a question? Was there not language in either the court's decision or from witnesses that these actions by Mr. McClain and his, when I say, by the defendants, spanned, I don't know, five, six years, and more than 100 incidents? That's true. I mean, that's pretty, you've got to admit. No, there's no question. But remember what was going on. This still wasn't, the most, look at the, it's in our brief. You have years there where at the end of the year there was 200,000 outstanding. There was 200,000 positive in one year. This is not, we're siphoning money off, and this enterprise is at risk. It's just not that case. Mr. Epstein, at one point, the enterprise was unable to pay its taxes, and it was unable to meet mortgage payments, and as a result was charged, had to pay a penalty, is, does that matter? Well, that's the $900,000 we're saying is an absolutely legitimate damage. But I'm asking that in response to your question that nobody got hurt here and that no, and that there was never any risk. Well, there were moments, there were moments when they were cash-shy. That's what was true of the other end. That's why he was moving money back and forth, because some enterprises were cash-wealthy and some enterprises were cash. But those were his businesses. Those weren't Tully's businesses. Yeah, and they were, his guarantee on the loans to this put them in play. He, this is not a person who was simply protecting himself. He put his own assets on the line for this enterprise when he guaranteed those loans. Don't you think the result in this case, as it stands right now, kind of, and you're talking about it's to deter others. You don't think that's going to deter, you don't think the word went out on this? I would be willing to, I'm not in that business, but I would be willing to bet the financial community, everybody knew about it the day it happened. And if the president of Boeing, if the president of Boeing authorizes an improper accounting practice, you take his kid's stock away? That's what happened here. And it's wrong. It's excessive. Are we saying he should have no punishment? We're not saying that. We're not saying that. This is a matter of the degree. He's lost his whole, in fact, he, this was a, if you believe Mr. Tully, it's a $36 million enterprise. He lost it all. This is not just $5 million. You have to unwind it. Decide what you're going to decide about actuals. Decide what you're going to decide about punitives. And go back and dissolve this thing. Sell the enterprise. Let everybody get repaid and put it on the market at a free market rate. And let everybody go their way, if that's what has to happen. That's the bargain. That's the statute. Dissolve it. Thank you. Thank you, Mr. Tully. And I don't know if I've used my rebuttal time. You'll get a little rebuttal time. Yeah, you used it. 30 seconds. We'll let you have a little time. Counsel? Morning again, your honors. May it please the court. When a fiduciary. Say your name, counsel. Michael Marano. I apologize. Just that you're being recorded. And it's really important to know when one finishes and the other one starts. Sure. When a fiduciary takes money he's entrusted with and uses it for his own personal purposes, whether he puts it in his own pocket or gives it to his other businesses, as counsel concedes, that is a breach of that fiduciary duty. And although in the trial court, Mr. McLean tried to argue that what he did, and I heard a little bit of that today from counsel, was appropriate and it was simply a business practice that he engaged in. The trial court in this case, when he heard all the evidence, found what Mr. McLean did to be quite shocking. And I think what was even more shocking wasn't the fact that he took money and used it to shore up other businesses, but the attitude that this was okay. And worse, and if you read his opinion, which Judge Palmer said is when they made the agreement in June of 2000 that he wouldn't do it anymore. And then he went around, turned around, and then immediately did. Mr. Epstein complained in his brief about the judge using the fact that Mr. McLean was nonchalant about the whole transaction as one of the elements for the award of punitive damages. How do you respond to that? I don't believe he used it in connection with the punitive damage award. I think, though, it does reflect the trial judge's attitude about what I'm talking about is the attitude of this defendant for what he did as a fiduciary, as if he had no fiduciary responsibility. As if because, as counsel said, this was a good investment, what is Tully complaining about? He's just using some money to help himself, but he's going to pay it back. That's his attitude. I don't think- Was all the money paid back? After we caught him, yes. What happened here is he'd been taking money since the year 2000, shortly after Mr. Tully invested. Mr. Tully caught him in June of 2002, it was supposed to stop. Then for the next two and a half years, so it's a six year period, for the next three and a half years, excuse me, he kept taking money, but he hid it in different ways. So when we caught this in 2005, by that point there was $2 million that was outstanding. Yes, did money go out and come back in? Yes, but it's like any embezzler that takes money out of the till and says, don't worry, I'm going to gamble down at the boat and I'll put it back when I win. But sometimes you don't win. Let me ask you about the 13% interest. Yes. Mr. Epstein really takes a great number of interest because that, I think everybody can agree that that's a pretty high interest rate. And the question that I have is, why not use the standard measure of interest that the statutory rate, Ms. Epstein argued, is appropriate as opposed to using the 13% that really went to this other deal that McLean had between himself and his deal in New York? Sure, the first thing to keep in mind is that whenever you have a breach of fiduciary duty, what you want to do is make sure that the breaching fiduciary accounts for any benefit he received as a result of the principal's money. So what benefit did McLean get by using OTD's money to shore up his other businesses? So that raises the question is, if those other businesses that needed shoring up had to go to the marketplace and borrow money, what would they have to pay? What would the interest rate be? In other words, McLean got the free use of OTD's money to shore up his other businesses. He gave it to them. What would they have to pay if they had went out into the marketplace and said, okay, I need a half a million dollars to shore up my business for the next six months or a year, whatever it was. That was the issue we were trying to address in the trial court. And what we looked at, this entity that the 13% came from was 455 Central Park West. Money from OTD in this case was taken out of OTD's bank accounts and loaned to that entity. This wasn't just some entity we picked out of the blue sky. This was one of the entities to which our money went. So then when we went to 455 Central Park West, we saw that Mr. McLean himself, when he loaned his own money to 455 Central Park West, he charged him 13%. Why? Because it was a risky company. It wasn't. This wasn't a prime loan. He charged him 13% because he could. Because it was appropriate. You know, it was a business is business. It was an appropriate rate for the risk involved. And here, you've got to keep in mind, the money taken out of OTD was being loaned to shore up businesses. Again, these weren't prime loans. A prime loan is where you have a credit worthy borrower that has assets standing behind him. Here we're shoring up businesses. The second thing to keep in mind, there was no security here. There was no pledge of assets. There was no mortgage. Counsel makes reference to the mortgage loans. We had the underlying property as security. That's true. You're going to get a lower interest rate when you have that. Again, in this case, there was no loan documentation. There wasn't a signed note. There wasn't a record. Matter of fact, the only record in OTD's books and records was a phony record. The money was shown as being deposited to a real estate investment account or in a money market. This was a total fraud. So the risk involved in this money going, if Mr. McLean had dropped dead and Tully was left with this partnership, we would have no record of where this money went or what happened or how, you know, what went on, and try to get the money back from these failing businesses. That's the reason why we said 13% was appropriate. We used that as the standard to say, okay, if McLean could and felt that he deserved 13% to loan money to this 455 Central Park West, why shouldn't OTD, if McLean's getting the benefit of using OTD's money, get the same interest rate? But maybe the 13% when McLean did it was he was overcharging it for his own benefit, and he was acting unreasonably. The court, however, has an obligation to act reasonably. I think. In assessing what the actual damages are, you have to use the true amount of the money that was taken and outstanding and apply a reasonable rate. Not one that is derived because of leverage in the situation. I totally agree with you. But the question then is what is a reasonable rate to take money from OTD and loan it to businesses that needed shoring up without security, without a guarantee, without documentation, what is a reasonable rate to do that? What would a reasonable person do in that situation? Was there other evidence presented to the trial court judge as to what a realistic rate of interest was as of that period of time? The only evidence that was presented was Mr. McLean testifying that what he thought a reasonable rate of interest was, which was the prime rate. This was 2005 you said? These loans began in 2000, the year 2000, stretching through 2005. So interest rates were fluctuating then. But clearly, clearly what we're talking about is what benefit did Mr. McLean receive by using our money as opposed to having his companies borrow money and ask yourself would a reasonable person have made a prime rate loan under these circumstances to these failing businesses? And clearly that's the issue. It's not oh the prime rate was this or the prejudgment interest rate is that. It's what benefit did McLean get by using OTD's money to make these loans? I'd like to, if I may change the subject, I'd like to, I'd like you to please explain to me the denial, the court's denial of the dissolution. Yes. You know, it's, go ahead. Okay. You know, I'll leave it at that. Okay. We were confronted with a situation where essentially what McLean argues is the only way that Tully had to get rid of the manager in this case, a manager that he caught stealing. The only way he had to get rid of that manager was to dissolve the company, lose his investment. That's what they said. That's their argument. Their argument is the only way to get rid of the manager in this case is to dissolve the investment. It's a great investment. Counsel's right about that. Tully loves this investment. He doesn't want to lose it. But they're saying he has to lose it because if you want to get rid of the manager, that's the only way. You have to read the agreement and the statute together because they are an integrated, they are integrated. The agreement is very specific. The only way to remove the manager is, it just says the manager can be removed and then there's a dissolution. It doesn't speak to how you remove a manager. The agreement is silent on that. The act, which applies to the agreement, the agreement incorporates the act specifically, the act says the only way to remove a manager is by majority vote. And there was going to be no majority vote here. We have 50-50 ownership. McLean's the manager. He's not going to vote himself out. That was clear. So we have a situation where we're stuck with the manager. Okay. There's going to be no vote. He's not going to be eliminated. What the agreement doesn't say is that if a member is dissociated, that's a specific term of art under the act, dissociation, expulsion. If a member is expelled, there's no dissolution. Okay. Neither the agreement nor the act says that. So we have a situation where... You say those documents are silent on that question? On the question of... If expelled? Yes, expulsion. Dissociation. Expelled him or, you know, they're out of here, get out of here. Right. Neither the agreement nor the act says if you expel somebody... Here's my question. But does not the agreement state that a manager, the manager, must also be a member? Yes, the agreement says... Okay, now, if you are expelled, you know, hell, it sounds to me like expelled means you're no longer a member. That's exactly what it is. And then moving forward from that, then how can he be the manager? Exactly. That's exactly right. That's exactly right. Well, that would mean, that means, sounds to me like the entity should have been dissolved. No, no, not at all. Because the... You have to look at the agreement and the act. The agreement and the act doesn't say, because a member is expelled, that there has to be a dissolution. The agreement doesn't say, if the manager member is expelled, there has to be a dissolution. It doesn't say that. It doesn't say that, okay? What the agreement says is exactly what you said, Justice. And that is, if there's a manager and he loses his interest, his 1%, and say he gets a judgment against him and somebody buys him, okay, then because he doesn't own an interest anymore, he's disqualified from acting as the manager. Okay, that is, if you read the act and you read the agreement, there's nothing in there that says, under those circumstances, there has to be a dissolution. And that's all that happened in this case. It was a, the manager is no longer permitted to act because he was disqualified because of the unique terms of this agreement. But, and when you're looking at dissolution, which is a pretty serious remedy. So, do they have to get a new manager? I mean, it sounds, I'm trying to understand your argument, and it sounds, I have to say, it sounds like some hair splitting to me. But, you know, if the manager has to be a member and the manager is expelled, then what happens? Then there has to be a new manager elected. There's no question about it. And how is that going to happen? I mean, you know, I think all of this. Well, in this case, because of the unique way of this agreement, and it was just because of the unique way of this agreement, what happens is Tully then becomes the majority owner. And by majority vote, which the statute says, you replace a manager by majority vote. So Tully would effectively, on the expulsion of Pam as the manager, gets to elect a new manager. Which is, if you put yourself in a position, you invested in this partnership, or this LLC agreement, LLC, if you have a manager that is defrauding you, is taking money, is concealing it, is acting wrongfully, and you don't want to give up your investment, there is a mechanism under the agreement, as we see it, to change the manager. That is, because the agreement requires the manager to also be a member, you don't have to be a member of an LLC to be a manager. Couldn't the agreement have really spelled that out a little clearer? Absolutely. So the judge wouldn't have to read the agreement, and then read the statute, and then try to put the two together, because the agreement doesn't define what, quote, removal means, for purposes of the circumstances that occurred here. And so the judge is using his best judgment, based on the statutory language, and the facts that are presented in this agreement. True. The agreement is a little difficult to read, and you've got to read it carefully. This problem could have been very simply resolved by saying, in the language that says, if the manager is removed, the company is dissolved, it could have said, if the manager is expelled as a member, the company is dissolved. That would have, then we wouldn't be standing here today, and it would have been clear. But it doesn't say that. It doesn't say that if the manager is excluded as a member, the company is dissolved. The only reason the manager had to be replaced here is because of this other unusual requirement that you own an interest, a 1% interest. And as I said, the way this agreement was structured, the way I view it, it actually anticipated this situation, and allowed a manager to be replaced without dissolving the company, which is a drastic. They anticipated this situation. Wouldn't it have said, if a manager is removed, he can be, the majority gets to elect a new manager? That would be clearly anticipating this situation. I'm not sure that what the facts as we know them anticipated this at all. Well, the fact that you can remove a manager, you have to, unfortunately, these LLC agreements incorporate the statute to the extent that the agreement itself doesn't address a specific issue. So you have to read the two hands in hands. And they use technical language in these documents, like removal, like dissociation. You'll see in other agreements, they specifically talk about dissociation and the effects of a dissociated member. Because that's a technical term in the LLC Act, but it wasn't in here. So you have to read the agreement the way it's written. You can't add things. You can't assume things. The agreement says, dissolution only occurs on a removal of the manager. Removal isn't defined in the agreement. So you have to look, the statute says you have to look to the statute for what removal means. And removal under the statute is majority vote. And that didn't occur here. And that's what the judge said. He said, look, I'm not removing anybody. I can't remove anybody. All I'm saying is, I'm dissociating this member. I'm expelling him. And let the consequences be what they be under the agreement. So that's the argument there. This argument about we're taking the children's shares is simply incorrect. There is no testimony. There's no testimony at all by Mr. McLean that his children own any shares. What he said was, all he said was that this is a family partnership. But what really happened here was, as we're talking here, in the trial court, in the answer, in the counterclaim, during the trial, during the closing arguments, it was all, everything was McLean. All of the transactions, money going out, distributions, all went to McLean. These were, and the trial court specifically found, based on all this evidence, how the transactions were happening. Sure. My question about MCL construction. Yes. Not a party. Right. You know, I just have a problem with the court awarding or demanding or requiring a non-party to do anything. He didn't. He did not do that at all. If you look at the evidence, Your Honor, including our damage calculations, the word MCL construction was never mentioned by anyone until the post-trial motion when they said this money went to MCL construction. There's no evidence in the record that it did. This fee we're talking about, if you look at Plaintiff's Exhibit 3, there's an agreement between OTD, the LLC, and MCL management, which was a defendant, that says MCL management can get a management construction management fee. That's what we're talking about, MCL management. And that's the fee, you know, we said it was part of the fees that MCL management got while it was creating phony financial statements, letting money go out the door to unrelated businesses. And that's part of what's forfeited. This issue about MCL construction came up post-trial motion, and they're saying, wait a minute, this $190,000, whatever it was, went to MCL construction. Well, first off, we say somebody should have mentioned that beforehand. And second off, where's the proof? Where's the proof? It's not in our evidence. Our evidence shows here's the fees that were paid to the manager that committed the fraud. This is what should be forfeited, and that's what the judge ruled. Now, was it an abuse of discretion? Because after the trial, in a post-trial motion, they said, well, that money really went to MCL. The judge is denying it. He said, I'm denying it. I didn't say it goes to MCL construction. There's nothing in the order that talks about MCL construction getting anything. That's just something they've made up now. So that issue was really kind of a red herring that kind of came out of the blue, as did the children argument, was something that they brought up, you know, after the fact, saying. And the interesting thing and the shocking thing about that is what they really wanted was they wanted children to get some of the punitive damage award. That's what they said, that 10% of the punitive damage award should be paid to this LPDA, which McLean doesn't deny. He controls that entity. That's one of his entities. And we thought, and I think the trial judge did not abuse his discretion in saying, no, I'm not going to give Mr. McLean 10% of the punitive damage award. Please wrap up, Mr. Morrow. Your Honors, again, going back, you know, we had a situation, we had a breach of fiduciary duty that's admitted. Counsel doesn't believe there was fraud involved here. You know, I don't know what he thinks fraud is, but when you lie to your partner, you give them phony financial statements, you lie to banks. They submitted phony financial statements to banks with the same fraudulent information. To me, that's fraud. And punitive damages, forfeiture of fees, and all of the remedies that were awarded by the trial court were reasonable. There was no abuse of discretion here, including the 13%. It may be high, but all he did was try to assess what a reasonable person would have charged to lend money to these kinds of entities under these circumstances. Using the three times multiplier on punitive, arbitrary? Not at all. Not at all, Your Honor. Why not? Well, for a couple of reasons. Number one, remember, we sought damages in the amount of $2 million, compensatory in this case. The judge cut that in half. We didn't agree with him, we don't agree with him, that he should cut that in half because McLean owned 50% of the company. That's not before us. No, that's not before you. We have a given as to what the actual damages are. We can quibble about the 13%. Right. Now, let's zone in on this three times multiplier. Okay. Three times multiplier. Why is it justified? The total compensatory award was 50%. He cut it in half, okay? For purposes of punitives, he withdrew from the compensatory all the money that was the forfeiture of fees that were paid. So he effectively cut, he cut the compensatory in half to begin with. We asked for $6 million in punitive, by the way, and he gave us $3 million. If you look at, there's two issues here. One is an abusive discretion standard under the common law. Was it excessive? Was three times the compensatory, treble damages is what we asked for, which, you know, is in statutes. It's used commonly. It's triple damages. That's what we asked for. Was it excessive in this case? No, because as Justice Cunningham recognized, Mr. McLean said he was worth $100 million. You know, you have to make the punishment hurt, and $3 million to $100 million plus person, yeah, it hurts. Absolutely it hurts, but it's not excessive. Under the constitutional challenge that they raised, which is a de novo standard, that's a whole de novo standard, you look at the cases, and they've approved 25 to 1, 11 to 1, all over the board. So 3 to 1. The Supreme Court looks like, I'm talking about the United States Supreme Court, kind of maxed out at 10. Yes, depending on the circumstances. Yeah, I agree with you. They say double digits, they start getting a little concerned. But we're at 3 to 1, and with a defendant that you have to deter, you have to punish. You can't say, okay, $50,000 to Mr. McLean, he'll write a check, a lot of, you know, we see that happening now where these banks are getting assessed the, you know, a $500 million fine, but they made $20 billion. I mean, so what? You know, they'll write the check and walk away. So to say this is, and the standard under the due process is grossly excessive. Was this grossly excessive as to violate a due process right, a 3 to 1? I don't think so, Your Honor. I don't think it's close. Thank you. Thank you. Mr. Epstein, brief rebuttal, please. Emphasis on brief. Brief. Mister, it is very clear that my client, Mr. McLean, got outlawyered at trial. My worthy opponent makes three flagrant misrepresentations of this record to this court. He keeps saying that the loans that Mr. McLean made were to shore up other companies. There is the only testimony in this record about the financial condition of other companies was by Mr. McLean that they had periods of cash flow shortage. There is not any evidence that they were shoring up those companies in the sense that those companies were in any respect in trouble, zero. Secondly, he keeps saying that he was caught stealing, that he was taking money. Respectfully, that's an exaggeration. He was borrowing and paying back. And he was paying back before the lawsuit was filed. And before he had taken and paid back even before the first meeting between them. Number three. Well, I think that there's a little license with language on both sides. Because I think your opponent would take issue with the fact that you can borrow from somebody without their consent. No, no, I'm not saying, Your Honor, I'm not saying it's not a breach of fiduciary duty. I'm saying it's not stealing. There is a difference here. Well, Mr. Epstein, with all due respect, I think that there is an argument to be made on the other side. Because I personally believe you cannot borrow something from somebody if they tell you, no, I don't want to lend it to you and you take it anyway. I'm not sure that that fits the definition of borrowing. And that's what happened here. Your Honor. He said no, and he took it anyway. So is that borrowing? So I think we should get off the semantics. You're both using some hyperbole that I'm not sure is helpful. The 13 percent rate for the New York deal, my colleague, Ms. Walsh, points me back to the record. It was explained that that was because that was a construction loan where commercial lenders were going to charge 17 percent. And Mr. McClain did not, as he testified, did not set that rate. He agreed to it. Other people had made the loan. He was offered the chance to participate in the loan. But let's go to the more important thing. This Court is going to have to make a decision on the statute and this agreement. And with all due respect, this Court has to decide very crisply and clearly, and I go back to the kind of rhetoric, the kind of word carpenting that we were, that the Chief Judge was referring to, does replace, does replace include or not include judicial replacement by order? Counsel was wrong. Mr. Tully was not put in as manager by a vote, maybe later he was, after they reorganized. I don't know. It's not in the record. He was put in by order of Judge Palmer. Judge Palmer replaced him. That's not removal of the manager? You have to decide. Does replace include that? We get an argument here. Well, they didn't specifically say dissociation. They used a generic word. Replace is not defined in the statute. This is not where, oh, we should read the agreement as if it's incorporating a definition. Ms. Dashteen, we're talking about removal. Remember, you know, you're right when I say let's be circumspect with our use of language. We were, your opponent talked about removal and you're talking about replace. I think that's a, those are two different things. Your Honor, the agreement, the magic word is replace. Under the statute, removal or dissociation of any member, mandatory, not the manager, member, triggers dissociation. That's what the law says. That's the deal with an LLC. Mr. Tully, who's got plenty of lawyers, he's very sophisticated. He's a lawyer himself. He, who, by the way, as the record shows, once represented this entity. And it's real estate taxes. He's very familiar. He bought into this. He bought into the statute. He didn't have to. The deal is the deal. And when they kicked out Pam, and when they kicked out the, the, as a member, and when it was removed as manager. Beyond rebuttal, and that's what you're supposed to be doing, rebuttal. We're not arguing the whole thing all over again. I think I've completed, unless the court has more questions. I think you've both made your points. Very spirited arguments. Thank you very much. Thank you, Your Honor. And this matter will be taken under advisement.